## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Dennis Hellige, Derivatively on Behalf of SUNEDISON, INC., <br><br> Plaintiff, <br><br> vs. <br><br> AHMAD CHATILA, BRIAN WUEBBELS, EMMANUEL HERNANDEZ, ANTONIO R. ALVAREZ, CLAYTON C. DALEY, JR., GEORGANNE C. PROCTOR, STEVEN TESORIERE, JAMES B. WILLIAMS, and RANDY H. ZWIRN, <br><br> Defendants, <br><br> and <br><br> SUNEDISON, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Dennis Hellige ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of nominal defendant SunEdison, Inc. ("SunEdison," or the "Company"), files this Verified Shareholder Derivative Complaint against Ahmad Chatila, Brian Wuebbels, Emmanuel Hernandez, Antonio R. Alvarez, Clayton C. Daley, Jr., Georganne C. Proctor, Steven Tesoriere, James B. Williams, and Randy H. Zwirn (collectively, the "Individual Defendants")[1] for breaches of their fiduciary duties as directors and/or officers of SunEdison and unjust enrichment, and

---

[1] The Individual Defendants and the Company are collectively referred to herein as "Defendants."

alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SunEdison and its affiliates, news reports, securities analysts' reports and advisories about SunEdison and its affiliates, and information readily obtainable on the Internet.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by SunEdison's directors and two senior-most officers for breaches of their fiduciary duties and unjust enrichment beginning on June 16, 2015 through the present (the "Relevant Period").

## SUMMARY AND OVERVIEW

2.      SunEdison is a diversified developer of wind and solar energy projects, having financed, developed, owned, and operated over 1,300 solar and wind projects in 20 countries. In the operation of its business, SunEdison is dependent upon the use of so-called "yieldcos," which have become a popular means of financing various types of clean energy production. Yieldcos are dividend growth-oriented public companies, created by a parent company, such as SunEdison, that bundle long-term contracted operating assets in order to generate predictable cash flows. The parent company acquires assets such as power-generating plants, and then sells those assets and their customer contracts for power purchasing to the yieldco. The contracts then generate ongoing cash flows, which are meant to be distributed to the yieldcos' shareholders in the form of dividends.

In order for a yieldco to obtain capital to finance its acquisitions from its parent company, it frequently turns to an initial public offering.

3.      The Individual Defendants breached their fiduciary duties by causing SunEdison to issue false and misleading statements of material fact in SunEdison press releases beginning on June 16, 2015 by stating that SunEdison had the financial wherewithal to sustain continued growth.

4.      However, as SunEdison continued its acquisition binge, it was revealed that the entire scheme was nothing more than a house of cards.

5.      On August 6, 2015, SunEdison issued a press release announcing its financial results for the quarter ended June 30, 2015, reporting a loss of $263 million on $455 million of revenue, and a net loss of $0.93 per share compared to prior estimates of a net loss of $0.55 per share.

6.      On October 5, 2015, SunEdison filed a Form 8-K with the SEC announcing layoffs of 15% of its workforce and restructuring charges of $30 to $40 million for the quarter ended September 30, 2015 through the quarter ending March 31, 2016.  According to the Form 8-K, SunEdison's debt was in the amount of $11 billion, which included debt from several recent multi-billion dollar deals to acquire new wind and solar assets.

7.      On October 6, 2015, the *Wall Street Journal* reported in an article titled "SunEdison Won't Complete $700 Million Buyout of Latin America Power" that as SunEdison's "woes mount[ed]," SunEdison failed to make a required $400 million upfront payment for its roughly $700 million planned acquisition of Latin American Power. The article reported that attorneys for Latin American Power stated that SunEdison was in breach of its obligations.

8.      On October 7, 2015, SunEdison lowered its 2016 projections and announced in a press release that it would not sell any projects that year to SunEdison's subsidiaries, its yieldcos,

TerraForm Global, Inc. ("TerraForm Global") and TerraForm Power, Inc. ("TerraForm Power"). Defendant Chatila announced on a call with analysts that SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a yieldco." Even worse, Defendant Chatila announced that SunEdison planned to reduce expansion plans in Latin America and other emerging markets, which were the yieldcos' geographic focus. Defendant Chatila explained that SunEdison "deemphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market." In other words, the project acquisition strategy upon which the yieldcos depended to effectuate SunEdison's business plan would not be carried out.

9.    In response to the new revelations of the Company's risky and weaker future, SunEdison's stock price plummeted and several prominent hedge funds sold their positions in SunEdison.

10.    Once the truth emerged, SunEdison's common stock price fell from a high of $31.31 per share at the start of the Relevant Period on June 16, 2015 to close at $7.09 on October 27, 2015.

11.    On January 15, 2016, SunEdison's common stock closed at $2.74 per share.

12.    The Individual Defendants' breaches of fiduciary duty have subjected SunEdison and its Chief Executive Officer ("CEO"), who is also a Company Director, and its Chief Financial Officer ("CFO") to seven securities class action lawsuits pending in the United States District Court for the Eastern District of Missouri, Eastern Division, United States District Court for the Northern District of California, and the Superior Court of the State of California for the County of San Mateo. As a result, SunEdison faces a risky and bleak future, due to the inability to obtain affordable future debt financing, losses due to the unjust enrichment of Individual Defendants who

4

were improperly over-compensated by the Company, including through bonuses connected to the Individual Defendants' scheme of intentional or reckless misconduct and false and misleading statements that were made intentionally or recklessly, which will going forward cost the Company millions upon millions of dollars.

13.    The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are the Company's current Directors, of the substantial likelihood of their liability in this derivative action and of certain of them in the securities fraud class action lawsuits, of their not being disinterested and/or independent Directors, of their causing the Boards of TerraForm Global and of TerraForm Power to be improperly replaced, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    Jurisdiction is conferred by 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Plaintiff is a citizen of Illinois. None of the Defendants are citizens of Illinois.

16.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' preparation and/or dissemination of false or misleading information—occurred in this district, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this district. The Company's maintains headquarters located in this district at 13736 Riverport Drive, Maryland Heights, Missouri.

17.     Each Defendant has minimum contacts with the U.S. and Missouri, as they have contracted in Missouri and the U.S., or have frequently traveled here, on SunEdison business and otherwise, or have authorized acts and actions which have had a sufficient impact in the U.S. or on SunEdison's shareholders and investors residing here to justify the exercise of jurisdiction over them.

## PARTIES

18.     Plaintiff Dennis Hellige ("Plaintiff" or "Hellige") is, and has been an owner of SunEdison common stock throughout the Relevant Period. Plaintiff is a citizen and resident of Illinois.

19.     Nominal Defendant SunEdison is a Delaware corporation with its principal executive offices located at 13736 Riverport Drive, Maryland Heights, Missouri. It is a global renewable energy company. SunEdison develops, manufactures, and sells silicon wafers and is a major developer and seller of photovoltaic energy solutions.  SunEdison's subsidiary, SunEdison LCC, is one of the world's leading developers of solar energy projects. The company markets its products to corporations, utilities, governments and chip manufacturers. Through Sun Edison LCC, SunEdison is one of the world's leading developers of downstream solar energy projects. Directly and indirectly through its wholly owned subsidiary, SunEdison Holdings Corporation, SunEdison (together with SunEdison Holdings Corporation, "SunEdison") is the sponsor and majority stockholder of TerraForm Global and TerraForm Power.  SunEdison maintains approximately 98.2% of TerraForm Global's voting power.  As of April 14, 2015, SunEdison holds more than 50% of the TerraForm Power's voting power. SunEdison's shares are listed and trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SUNE."

20.     Defendant Ahmad Chatila ("Chatila") has been SunEdison's CEO and President

and one of its Directors since March 2009. Defendant Chatila has been a TerraForm Global director since May 2015.  Defendant Chatila was TerraForm Global's Chairman of the Board between May 2015 and November 2015.  Defendant Chatila has been a director at TerraForm Power since before its initial public offering on July 23, 2014.  According to SunEdison's Schedule 14A filed with the SEC on April 23, 2015 ("SunEdison's 2015 Proxy Statement"), as of April 2, 2015, he beneficially owned 587 thousand shares of SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $18.2 million at the beginning of the Relevant Period. For the fiscal year ended December 31, 2014, he received $7.7 million in compensation from SunEdison, of which $837 thousand was in cash, and $5.3 million was in stock awards.

21.     Defendant Brian Wuebbels ("Wuebbels") has been SunEdison's Executive Vice President and CFO since May 2012. Defendant Wuebbels has been the CEO and President of TerraForm Global since November 20, 2015, and a Director of TerraForm Global since May 2015. Defendant Wuebbels has been a director at TerraForm Power since before its initial public offering on July 23, 2014.  According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 240 thousand shares of SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $7.44 million at the beginning of the Relevant Period.  According to TerraForm Global's prospectus for its July 31, 2015 initial public offering ("IPO") filed on Form 424(b)4 with the SEC on August 4, 2015 ("Prospectus"), after the IPO, Defendant Wuebbels beneficially owned 536.5 thousand shares of TerraForm Global's Class A common stock.  Given that, on August 5, 2015, one share of common stock traded for $13.60, his TerraForm Global Class A common stock was worth $7.3 million after the IPO.  For the fiscal year ended December 31, 2014, he received $3.05 million in compensation

from SunEdison, of which $467 thousand was in cash, and $1.9 million was in stock awards.

22.     Defendant Steven Tesoriere ("Tesoriere") has served as a Director of SunEdison from October 2012 until his abrupt resignation on January 19, 2016.  Until November 20, 2015, he served as a Director at TerraForm Global and at TerraForm Power.  He served as a member of SunEdison's Audit Committee.  Defendant Tesoriere is Managing Principal and Portfolio Manager of Altai Capital Management, L.P. ("Altai").  Altai is a significant investor in SunEdison, holding at least 1.8 million of SunEdison's shares.  Defendant Tesoriere is credited with convincing SunEdison to use the yieldco structure that resulted in the formation of TerraForm Power and TerraForm Global.  According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 6.43 million shares of SunEdison's common stock, which was 2.36% of the Company's issued and outstanding common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $199.3 million at the beginning of the Relevant Period.  According to the Prospectus, after TerraForm Global's IPO, he beneficially owned 1.85 million shares of TerraForm Global's Class A common stock.  Given that, on August 5, 2015, one share of common stock traded for $13.60, his TerraForm Global Class A common stock was worth $25.2 million after the IPO.

23.     Defendant Emmanuel T. Hernandez ("Hernandez") has served as Executive Chairman of the Board of Directors of SunEdison since November 2015.  He is a member of SunEdison's Audit Committee.  From April 2005 to November 2008, Defendant Hernandez served as the CFO of SunPower Corporation. He retired as CFO of SunPower in November 2008, but continued in a transition role at SunPower until January 2009.  According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 157.1 thousand shares of SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his

SunEdison stock was worth $4.87 million at the beginning of the Relevant Period. For the fiscal year ended December 31, 2014, he received $335.5 thousand in compensation from SunEdison, of which $151 thousand was in cash, and $184.5 thousand was in stock awards.

24.   Defendant Antonio R. Alvarez ("Alvarez") served as a Director of SunEdison since 2012. He is a member of SunEdison's Compensation Committee. He is the former Chief Operating Officer ("COO") at Aptina Imaging, an imaging technology company, a position he has held since August 2012. Prior to joining Aptina in 2012, Defendant Alvarez served as COO of Advanced Analogic Technologies from 2010 to 2012 and CEO of Leadis Technology from 2005 to 2009. Defendant Alvarez also previously served as Senior Vice-President of the Memory Products Division as well as Research & Development at Cypress Semiconductor. According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 67 thousand shares of SunEdison's common stock. Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $2.08 million at the beginning of the Relevant Period. For the fiscal year ended December 31, 2014, he received $273.6 thousand in compensation from SunEdison, of which $89 thousand was in cash, and $184.5 thousand was in stock awards.

25.   Defendant Clayton Daley, Jr. ("Daley") served as a Director of SunEdison since August 1, 2014. He is a member of SunEdison's Audit Committee and Compensation Committee. Defendant Daley is the former Vice Chairman and CFO of The Procter & Gamble Company. According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 12.9 thousand shares of SunEdison's common stock. Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $400 thousand at the beginning of the Relevant Period. For the fiscal year ended December 31, 2014, he received $224.6 thousand

in compensation from SunEdison, of which $70.8 thousand was in cash, and $153.8 thousand was in stock awards.

26.     Defendant James B. Williams ("Williams") served as a Director of SunEdison since 2003.  He is a member of SunEdison's Compensation Committee and Nominating and Corporate Governance Committee.  Defendant Williams is a Partner of TPG Capital (formerly Texas Pacific Group), a leading, global private equity firm. He joined Texas Pacific Group in February 1999. According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 181.2 thousand shares of SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $5.62 million at the beginning of the Relevant Period.  For the fiscal year ended December 31, 2014, he received $288.5 thousand in compensation from SunEdison, of which $104 thousand was in cash, and $184.5 thousand was in stock awards.

27.     Defendant Randy H. Zwirn ("Zwirn") served as a Director of SunEdison since 2013.  He is a member of SunEdison's Nominating and Corporate Governance Committee. Defendant Zwirn has served as CEO, Energy Service Division of Siemens AG, Energy Sector since January 2008. He also serves as President and CEO of Siemens Energy, Inc. with regional responsibility for the overall Energy Sector in the Americas. Siemens AG is a global technology company focusing on the areas of electrification, automation and digitalization.  According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, he beneficially owned 52.5 thousand shares of SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, his SunEdison stock was worth $1.63 million at the beginning of the Relevant Period.  For the fiscal year ended December 31, 2014, he received $269.9 thousand in

compensation from SunEdison, of which $85.4 thousand was in cash, and $184.5 thousand was in stock awards.

28.     Defendant Georganne C. Proctor ("Proctor") served as a Director of SunEdison since October 30, 2013.  She is Chairperson of SunEdison's Audit Committee.  Defendant Proctor, currently retired, is the former CFO of TIAA-CREF, a position she held from 2006 to 2010. From 2003 to 2005, she was Executive Vice President, Finance of Golden West Financial Corporation. Prior to that, Defendant Proctor served as CFO of Bechtel Group, Inc. from 1997 to 2002 and on the Board of Directors of Bechtel from 1999 to 2002.  According to SunEdison's 2015 Proxy Statement, as of April 2, 2015, she beneficially owned 26.9 thousand shares of the SunEdison's common stock.  Given that, on June 16, 2015, one share of common stock traded for $31.00, her SunEdison stock was worth $834 thousand at the beginning of the Relevant Period.  For the fiscal year ended December 31, 2014, she received $303.8 thousand in compensation from SunEdison, of which $85.4 thousand was in cash, and $184.5 thousand was in stock awards.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of SunEdison and because of their ability to control the business and corporate affairs of the Company, Individual Defendants owed SunEdison and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SunEdison in a fair, just, honest, and equitable manner. Individual Defendants were and are required to act in furtherance of the best interests of SunEdison and its investors.

30.     Each director and officer of the Company owes to SunEdison and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the Company and in the use and preservation of its property and assets. As directors of a public

11

company, Individual Defendants had the duty to disseminate accurate and truthful information regarding SunEdison's operations, finances, financial condition, as well as its present and future business prospects, so that the market price of SunEdison's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SunEdison, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of SunEdison were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

> (a) refrain from acting upon material inside corporate information to benefit themselves;
>
> (b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;
>
> (c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> (d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;
>
> (e) remain informed as to how SunEdison conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make

12

reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and (f) ensure that SunEdison was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

33. Individual Defendants by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of SunEdison, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Defendants has been ratified by Defendants who collectively comprised SunEdison's Board at all relevant times.

34. As executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, had a duty to correct such dissemination of inaccurate and untruthful information, and had a duty not to use their knowledge of material non-public information in order to earn personal profit through insider sales. Accordingly, Individual

Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

36. Each of the Individual Defendants further owed to SunEdison and the shareholders the duty of loyalty requiring that each favor SunEdison's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

36. At all times relevant hereto, Individual Defendants were agents of each other and were at all times acting within the course and scope of such agency.

## **BACKGROUND**

37. On May 29, 2014 the Company announced in a press release that TerraForm Power, a yieldco subsidiary of SunEdison, had filed a registration statement with the SEC for a proposed initial public offering, and on July 17, 2014, TerraForm Power began trading on the NASDAQ at $33.85 per share–33% above its IPO price. TerraForm Power offered 20.1 million shares and raised about $500 million in its IPO, valuing the company at around $2.4 billion. SunEdison retained nearly 95% of the voting power in the company.

38. During the next year the Company issued quarterly financial statements showing that the Company was increasing net sales and was poised for growth.

39. The Company also continued its acquisition strategy, announcing its acquisition of First Wind Holdings, LLC ("First Wind") for $2.4 billion in a transaction that was completed on January 29, 2015.

40. To fund these acquisitions, SunEdison raised $190 million through a secondary offering of shares in Singapore-based SunEdison Semiconductor Ltd, secured a $400 million credit commitment from several financial institutions, offered $350 million of convertible senior notes

14

due in 2022, offered $375 million aggregate principal amount of convertible senior notes due in

2023 and $375 million aggregate principal amount of convertible senior notes due in 2025.

41.     On May 7, 2015, SunEdison announced that one of its yieldco's, TerraForm Global,

had filed a registration statement in preparation for its IPO.

## DEFENDANTS' MISCONDUCT AND MATERIALLY FALSE AND MISLEADING STATEMENTS

42.     On June 16, 2015, SunEdison announced in a press release that it signed a definitive

agreement to acquire 100 percent of Globeleq Mesoamerica Energy ("GME"), a renewable energy

company based in Central America. In the press release, Defendant Chatila touted the expansion

of SunEdison, encouraging investors to buy into the big lie that the Company was building a plan

of sustainable growth:

> The acquisition of GME strengthens SunEdison's leadership position in the global
> wind energy market and significantly expands our presence in Central America, a
> region that offers growth opportunities for our emerging markets development
> platform. With this acquisition we not only gain an experienced and talented
> management team with a proven track record in the region, but also position
> ourselves to accelerate our performance and deliver attractive returns to our
> shareholders.

43.     However, unbeknownst to shareholders, this acquisition surge was funded on a

house of cards being propped up by false statements and omissions.

44.     Rather than address known needs to increase revenues and lower debt, SunEdison

again jumped into another acquisition. On July 20, 2015, SunEdison announced in a press release

that it had entered into a merger agreement with Vivint Solar, Inc. ("Vivint Solar"), a provider of

residential solar systems in the United States, for $2.2 billion in cash, stock and convertible notes.

Defendant Chatila was quoted in the press release:

> SunEdison's acquisition of Vivint Solar is a logical next step in the transformation
> of our platform after the successful execution of our First Wind acquisition in
> January 2015. We expect the Vivint Solar transaction to create significant value for

our stockholders through the accretion in our TerraForm Power ownership, the acceleration of our Incentive Distribution Rights and an immediate expansion of our capacity and bandwidth to grow our residential business in the U.S. and globally. As of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy more than 1 gigawatt per quarter.

\*\*\*

With Vivint Solar, we're tripling our value.

45.     On July 20, 2015 in an article published by *Forbes* titled "SunEdison Buys Vivint to Overcome Weakness in Residential Solar" that purchasing Vivint Solar "will turn SunEdison into a formidable player in the residential market, the one segment in which it hasn't been a key player."

46.     However, unbeknownst to investors and despite Defendant Chatila's assurances, SunEdison's acquisition plan was not sustainable.

47.     Rather than pulling back, SunEdison again charged ahead. On July 31, 2015, TerraForm Global launched its IPO.

48.     Originally, TerraForm Global intended to offer 56.6 million shares for between $19 and $21 each to raise a total of $1 billion. However, SunEdison was ultimately only able to raise $675 million, selling only 45 million shares at a price of $15 per share.

49.     Following the disappointing IPO, SunEdison's prices began to fall. However, Defendants continued to mislead investors into believing that the Company was on the right path.

50.     On August 6, 2015, only two days after the TerraForm Global IPO closed on August 4, 2015, TerraForm Global's Sponsor and controlling entity, SunEdison, announced disappointing financial results for the 2015 second quarter. Notably, SunEdison reported a loss of $263 million in its second quarter on $455 million of revenue. SunEdison had a net loss of $0.93 per share compared to Thomson Reuters' consensus estimates of a net loss of $0.55 per share. The

downside of SunEdison's rapid expansion business model had become more apparent to investors. The company's debt had ballooned to $11 billion to fund acquisitions, including a $2.4 billion deal to buy First Wind, a wind farm operator, and the $2.2 billion deal to buy Vivint Solar.

51.    Once again in the face of increasing debt, Defendant Chantila told investors:

> During the second quarter, we continued to balance operational execution while meeting our strategic objectives. On the operations front, our leading organic development engine continues to execute as we exceeded our megawatt (MW) and Retained Cash Available for Distribution (CAFD) guidance, delivering 404 MW and $63 million, respectively. In addition, TerraForm Power delivered $65 million of CAFD and continues to create value for shareholders with its leading DPS growth. Finally, we have largely completed our platform transformation with the agreement to acquire Vivint Solar, a leader in residential solar, as well as the IPO of our Emerging Markets-focused asset ownership platform, TerraForm Global.

52.    On the same day, *Motley Fool* published an article titled "SunEdison's Losses Become a Red Flag for Investors" emphasizing "how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion in debt and negative cash flow from operations." The article further stated that "[t]he market is finally starting to realize that this high-profile renewable energy powerhouse may actually be building a house of cards. . . . But building that scale has been costly for SunEdison. The company has a $10.7 billion debt load and continual losses quarter after quarter."

53.    While the market seemingly started to understand that SunEdison's plan might not be sustainable, the full extent of the Company's misrepresentations had not yet come to light.

54.    On August 11, 2015, *SeekingAlpha* published an article discussing these results. The article described the earnings miss as "whopping," "much greater than expected," and a "focal point for investors" who were worried that SunEdison had over-extended itself and would not be able to successfully follow through on its "incredibly ambitious" business strategy.

55.    On August 24, 2015, a *Motley Fool* article titled "SunEdison's House of Cards Is

Starting to Crumble," stated that "[i]nvestors are starting to see exactly what kind of business SunEdison [] has been building with its acquisition spree over the past year, and it may not be what they had expected," and "[SunEdison] doesn't have the balance sheet to build projects and it will have to find very creative ways to fund its growth."

56.     On September 6, 2015, *SeekingAlpha* reported in an article titled "The Case Against SunEdison" that there was good reason for investors to believe in the Company despite its recent losses.  The article stated in pertinent part:

> In spite of disappointing numbers in 2013 and 2014, the market had given SunEdison the benefit of the doubt. It has been given the benefit of the doubt because SunEdison continues to rapidly grow. Even though it continues to burn through capital, it has made some smart moves like the creation of its YieldCos and the acquisition of First Wind. The market continued to be bullish on SunEdison for these reasons and for just cause. After all, SunEdison is attempting to aggressively grow and expand and become the top renewable energy company in the world.

57.     On September 27, 2015, *Motley Fool* published an article titled "Once a Hedge Fund Favorite, SunEdison Has a Long Climb Out of Its Current Hole." The article reiterated SunEdison's excessive debt, stating "[b]ut at the end of the second quarter SunEdison had just $1.29 billion in cash not already committed to projects, and had another $10.7 billion of debt. Remember that was the company's financial position when it lost $263 million last quarter, so it isn't exactly swimming in cash flow to pay for debt."

58.     The September 27, 2015 *Motley Fool* article also stated the following regarding SunEdison's growth plan and its yieldco business model:

> In an act of desperation, SunEdison has created what it calls "warehouse vehicles", which will house projects until TerraForm Power or TerraForm Global can buy them. These vehicles are funded by debt and equity, but the cost is much higher than SunEdison would like. Warehouse 1.0 had an effective interest rate of 8.14% for its debt in Q2, and TerraForm Warehouse had an effective interest rate of 6.2% for its debt. Equity investors like First Reserve are also guaranteed returns on their investments, which could add up to $112 million in costs to Warehouse 1.0 alone.

59.     On September 30, 2015, *Zacks Equity Research* published an article titled "SunEdison Dragged by Heavy Debt Burden: Time To Dump?" The article discussed SunEdison's haphazard acquisition spree and ever-increasing debt expenses. The article stated the following in pertinent part:

> In an effort to strengthen its position as a renewable energy developer, SunEdison has been on an acquisition spree since last year. The company acquired First Wind, Solar Grid Storage and Vivint Solar, among others, to diversify its portfolio. Apart from this, SunEdison made alliances across several countries and won various projects.
>
> These moves, once believed to be strategic, are now being considered ineffective as SunEdison does not have the financial strength to fund the projects. The acquisitions have taken a toll on the company's balance sheet with total outstanding debt nearly doubling to $10.7 billion at the end of second-quarter 2015 from $5.4 billion a year ago.
>
> This resulted in a massive increase in interest expenses. In the first half of 2015, the company spent $302 million on interest expenses compared with $160 million in the comparable year-ago period. Apart from this, the company has been incurring losses from the semiconductor business and increased operating expenses.

60.     On October 5, 2015, SunEdison filed a Form 8-K with the SEC announcing that it will lay off about 15% of its 7,300 employees and incur restructuring charges of between $30 and $40 million from the third quarter of 2015 through the first quarter of 2016.

61.     The October 5, 2015 Form 8-K reported that on September 29, 2015, the Board of Directors of SunEdison approved management's plan to reorganize. The Form 8-K misrepresented the purpose of these layoffs as a vehicle to "optimize business operations in alignment with current and future market opportunities, and accelerate cash flow positive operations." In reality the Company did not have the cash flow to sustain its operations.

62.     On October 6, 2015, the *Wall Street Journal* reported that SunEdison had failed to complete a $700 million acquisition of Latin America Power, after it breached its obligation to make a $400 million upfront cash payment, citing sources familiar with the situation.

19

63.     After the article was published, an analyst estimated that Latin America Power accounted for 5% of TerraForm Global's entire initial portfolio on a megawatts basis.

64.     The article cited a lawyer for Latin America Power, Michael B. Carlinsky of Quinn Emanuel Urquhart & Sullivan LLP, who said that Latin America Power is "confident that the record will show that SunEdison breached its contractual obligations."

65.     On October 6, 2015, SunEdison stock price closed at $8.69 per share from a high of $31.31 during the first day of the Relevant Period on June 16, 2015–a whopping 72% price fall.

66.     On October 7, 2015, SunEdison announced that it lowered its 2016 projections, and it would significantly alter its business strategy. This shift in strategy would result in TerraForm Global and TerraForm Power losing nearly all the claimed benefits of their relationship with SunEdison. In particular, on a conference call to discuss this new strategy, Defendant Chatila stated, "we're going to shift our portfolio approach from one that drops almost all projects into Yieldcos to one that is flexible with more balanced distribution to warehouses and third-party sales." Defendant Wuebbels further stated that the prior business plan of dropping significant SunEdison assets into TerraForm Global "doesn't make sense," and that "the base assumption for 2016 is that no projects will be dropped into ... TerraForm Global."  On a conference call with investors, Defendant Chatila stated, "[w]e de-emphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market."

67.     On the same day, a *BloombergBusiness* article titled "SunEdison Pivots Away From Yield Companies That Can't Buy Plants" stated the following regarding the demise of SunEdison's yieldco structure:

> With their share prices down, the two TerraForm companies are no longer in a
> position to purchase power plants, Chatila said Wednesday during a conference call
> with analysts. That means he's looking for outside buyers or will hold the projects
> on SunEdison's balance sheet. It's the latest sign that this model, known as yieldcos,

is falling from favor in the renewable energy industry.

68.     On October 8, 2015, TerraForm Global filed a Form 8-K with the SEC confirming that SunEdison had terminated its purchase agreement with Latin America Power, and that TerraForm Global would lose the CAFD that had been projected to have been generated by the projects covered in the purchase agreement.

69.     On the same day, *SeekingAlpha* published another report titled "SunEdison: Is Bankruptcy Possible" noting that SunEdison's cash expenditures are "clearly unsustainable" with SunEdison burning "around $3.5 billion in the last four quarters." The article also noted that "SunEdison is over-leveraged." With "shareholders equity of only $632 million and total liabilities of $16,925 million, it is possible to calculate a debt to equity ratio of 26.78."

70.     Once the smoke and mirrors cleared, investors quickly abandoned the marketplace with several prominent hedge funds, such as Daniel Loeb's Third Point, selling their positions.

71.     Particularly troubling, Vivint Solar did not meet analysts' expectations, causing a stock drop. The results "severely call into question the health of the Vivint Solar organization (especially in the context of strong results from Sunrun and SolarCity)" wrote Credit Suisse's Patrick Jobin.  Jobin wrote that SunEdison investors should be concerned about what the Company is likely to be acquiring at this point:

> The decline in volumes and likely guidance miss, in addition to the weakening financial position (debt raises challenged recently), indicates troubles either organizationally or as a consequence of the pending acquisition by SunEdison which is supposed to close Q4-Q1. While no shareholder vote has been scheduled to approve the merger, it appears financial underperformance is not a MAC to get out of the deal. While TerraForm is actively trying to sell the operating assets upon acquisition, one must ask further questions about the strength of the development engine SunEdison is acquiring.

72.     On November 17, 2015, Deutsche Bank's Visual Shah cut his price target on SunEdison to $16 from $28, noting that his reading of the company's Form 10-Q included

"language around SUNE debt financing" that "could concern some investors who are focused on the balance sheet, while opex needs could complicate SUNE's ~$150M/Q Guidance."

73.    On January 7, 2016, *The Street* published an article titled "SunEdison Shares Plunge (Again), This Time on Debt Restructuring." The article stated the following in pertinent part:

> So much for the "January Effect." Shares of SunEdison (SUNE) were down more than 40% as of late-day trading on Thursday, after the company announced a series of transactions to restructure its debt.
>
> The transactions, which are expected to close on Jan. 11, 2016, will reduce the Missouri-based renewable energy company' debt by $738 million, the company said in a press release. The market took a less optimistic view on the news and shares were halted in late afternoon trading.
>
> SunEdison will be issuing $725 million in second-lien secured-term loans that will mature in July 2018 and have an interest rate of LIBOR plus 10%. (LIBOR is the benchmark rate financial institutions charge for making short term loans to each other.) Existing creditors agreed to exchange $335.8 million in existing convertible notes coming due between 2018 and 2025 for $225 million of the newly issued notes. The proceeds of these issues will be used to pay existing debts, interest, transaction costs and "general corporate purposes," the company said.
>
> SunEdison will also be issuing 39.8 million shares of common stock, of which 11.8 million of the shares are in exchange for $158.3 million of the company's preferred stock. The remaining 28 million shares are in exchange for $243.8 million worth of existing notes coming due 2018 to 2025.

74.    On January 12, 2016, SunEdison announced that it is selling three of its major solar energy farms in Hawaii that are worth $350 million as part of a larger effort to get rid of $336 million of its debt.

75.    On January 15, 2016, SunEdison's common stock closed at $2.74 per share.

## DAMAGES TO SUNEDISON

76.     As a direct and proximate result of the Individual Defendants' conduct, SunEdison has lost, and will lose, and has expended, and will expend, many millions of dollars.

77.     Such expenditures include, but are not limited to, legal fees associated with the many federal securities fraud class action lawsuits filed against SunEdison and its management, and the amounts paid to outside lawyers, accountants, and investigators in connection thereto.

78.     Such losses include those due to the unjust enrichment of the Individual Defendants and SunEdison's employees who were improperly over-compensated by the Company, including through bonuses connected to the Individual Defendants' false and misleading statements that were made intentionally or recklessly.

79.     Such losses include losses from SunEdison's not being able to drop projects into TerraForm Global and TerraForm Power and from the inability to obtain affordable future debt financing.

80.     As a direct and proximate result of the Individual Defendants' conduct, SunEdison has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague SunEdison's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.     Plaintiff brings this action derivatively and for the benefit of SunEdison to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of the Company and unjust enrichment, as well as the aiding and abetting thereof.

82.     SunEdison is named solely as a nominal party in this action.  This is not a collusive

23

action to confer jurisdiction on this Court that it would not otherwise have.

83.     Plaintiff is, and at all relevant times has been, a SunEdison shareholder.  Plaintiff will adequately and fairly represent the interests of SunEdison in enforcing and prosecuting the Company's rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

84.     A pre-suit demand on the Board of the Company is futile and, therefore, excused. At the time of filing of this action, the SunEdison Board consists of the following seven Individual Defendants:  Chatila, Hernandez, Alvarez, Daley, Williams, Zwirn, and Proctor (collectively, the "SunEdison Directors" or "SunEdison Board").  Plaintiff needs only to allege demand futility as to four of the seven SunEdison Directors that are on the Board at the time this action is commenced.

85.     The SunEdison Board of Directors caused the replacement of the TerraForm Global Board and the TerraForm Power Board on November 20, 2015.  Replacement of the Boards of both TerraForm Global and TerraForm Power are transactions that cannot be the product of the SunEdison Board's legitimate business judgment, as such Board replacement has caused SunEdison to be a defendant in two shareholder derivative actions brought derivatively on behalf of TerraForm Power in the Court of Chancery of the State of Delaware, and had caused investors and creditors to lose faith in each of SunEdison, TerraForm Global, and TerraForm Power. Therefore, the SunEdison Directors are not disinterested.  Thus, each member of the SunEdison Board breached his or her fiduciary duties, face a substantial likelihood of liability, and is not disinterested--and, therefore, demand upon each SunEdison Director would have been futile.

86.     Additionally, each member of the SunEdison Board conducted little, if any, oversight of SunEdison's internal controls over public reporting of financial statements and of SunEdison's scheme to make false and misleading statements, consciously disregarded their duties

to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. Moreover, each of the SunEdison Directors' large SunEdison and/or TerraForm Global stock holding reveals his or her interest in keeping SunEdison's and TerraForm Global's stock price as high as possible. Thus, for these reasons, too, each of the SunEdison Directors breached his or her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested.

87.     Moreover, by virtue of his current employment by SunEdison, SunEdison provides Defendant Chatila's primary employment and income, and he is beholden to the SunEdison Board of Directors that caused the replacement of the TerraForm Global Board and the TerraForm Power Board. As alleged above, the SunEdison Directors are not disinterested and Defendant Chatila is beholden to them as the SunEdison Directors control SunEdison, which provides Defendant Chatila his primary income and employment.

88.     Additionally, as alleged above, Defendant Chatila made, or caused the Company to make, and failed to correct, or caused the Company to fail to correct, the false and misleading statements alleged herein. Indeed, Defendant Chatila is most responsible for the fraudulent conduct alleged herein and is a defendant in the securities fraud class action lawsuits and in the shareholder derivative actions in the Court of Chancery in the State of Delaware. Defendant Chatila thus faces a substantial likelihood of liability. In fact, during the Relevant Period, Defendant Chatila owned over $18 million worth of SunEdison stock, which reveals his interest in keeping the Company's stock price as high as possible. Defendants Chatila thus faces a substantial likelihood of liability.

89.     Furthermore, each of the SunEdison Directors receives massive annual compensation from SunEdison, rendering each of them non-independent and beholden to

SunEdison, and thus the SunEdison Board that controls SunEdison.  For these additional reasons that SunEdison Directors are not independent or disinterested, and face a substantial likelihood of liability, demand upon them would be futile and is excused.

90.     Demand is excused as to all of the SunEdison Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

91.     In complete abdication of their fiduciary duties, the SunEdison a Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by A) engaging in the scheme to make, or cause the Company to make, and fail to correct, or cause the Company to fail to correct, the false and misleading statements alleged herein, and to fail to disclose to the investing public that the Company lacked adequate internal and financial controls; and B) failing to maintain for the Company adequate internal and financial controls.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

92.     The SunEdison Directors, as members of the Company's Board, were and are subject to the Company's Code of Business Conduct.  The Code of Business Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Business Conduct required the SunEdison Directors to also adhere to the Company's standards of business conduct.  The Code of Business Conduct requires all employees, officers and directors to

avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The SunEdison Directors did not comply with the requirements of the Code of Business Conduct.  The SunEdison Directors violated the Code of Business Conduct because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price.  Because the SunEdison Directors violated the Code of Business Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

93.     The SunEdison Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by the Individual Defendants and to prevent the scheme to artificially inflate the Company's stock price.  Indeed, the Directors knowingly or recklessly disregarded any such controls by causing and facilitating the scheme.  Accordingly, the SunEdison Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

94.     The SunEdison Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the SunEdison Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the SunEdison Directors would be futile.

95.     The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the SunEdison Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover

27

for the Company any part of the damages the Company suffered and will continue to suffer thereby.  Thus, any demand on the SunEdison Directors would be futile.

96.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the SunEdison Directors can claim exculpation from his or her violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the respective SunEdison Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

97.     The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

98.     The SunEdison Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company.  If there is a directors' and officers' liability insurance policy covering the SunEdison Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the SunEdison Directors were to sue themselves or certain of the officers of the Company, there would be no directors' and officers' insurance protection.  Accordingly, the SunEdison Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action

28

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the SunEdison Directors is futile and, therefore, excused.

99.     If there is no directors' and officers' liability insurance, then the SunEdison Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

100.     Thus, for all of the reasons set forth above, all of the SunEdison Directors, and, if not all of them, certainly at least a majority of the SunEdison Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Company's Board is excused as futile.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

101.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

102.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) make, and cause the Company to make, and fail to correct, and cause the Company to fail to correct, misrepresentations of material fact to the investing public; (ii) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (iii) fail to maintain adequate internal and financial controls.

103.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective internal control policies and procedures and make, and cause the Company to make, misrepresentations of material fact to the investing public. Because the actions described herein occurred under the authority of the Company's Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

104.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

105.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

### **FIRST COUNT**

#### **Against the Individual Defendants for Breach of Fiduciary Duty**

106.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

107.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

108.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

109.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or with gross negligence breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

110.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements about the Company, and failed to properly oversee the Company's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

111.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements about the Company.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising self-dealing transactions.

112.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein, to fail to maintain adequate internal controls, and to improperly replace the Boards of TerraForm Global and TerraForm Power.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, that internal controls were not adequately maintained, and that the Boards of TerraForm Global and TerraForm Power were improperly

31

replaced, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme, to fail to maintain adequate internal controls, and to improperly replace the Boards of TerraForm Global and TerraForm Power despite that such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

113.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND COUNT

### Against Individual Defendants for Unjust Enrichment

115.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of the Company.

117.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

32

118.     Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in SunEdison's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of the Company, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to SunEdison;

(c)     Determining and awarding to SunEdison the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing SunEdison and the Individual Defendants to take all necessary actions to reform and improve SunEdison's corporate governance and internal procedures to comply with applicable laws and to protect SunEdison and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to SunEdison's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen SunEdison's Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the SunEdison Board;

2.      a provision to permit the shareholders of SunEdison to nominate at least four candidates for election to the SunEdison Board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding SunEdison restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 1, 2016

Respectfully Submitted,

**WEHRLE LAW LLC**

By:  /s/ Chris Wehrle_____
Chris Wehrle, #45592MO
9909 Clayton Road
Suite 226
St. Louis, Missouri 63124
Telephone: (314) 254-0111
Facsimile: (314) 216-3700
Email: chris@wehrlelaw.com
*Attorney for Plaintiff*

34

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Attorneys for Plaintiff